[Cite as *Sanders v. Nationwide Mut. Ins. Co.*, 2014-Ohio-2386.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99954**

---

## SANDRA A. SANDERS

PLAINTIFF-APPELLANT

vs.

## NATIONWIDE MUTUAL INSURANCE COMPANY

DEFENDANT-APPELLEE

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-09-693116

**BEFORE:** Kilbane, J., S. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** June 5, 2014

**ATTORNEY FOR APPELLANT**

Timothy A. Shimko
Timothy A. Shimko & Associates
1010 Ohio Savings Plaza
1801 East Ninth Street
Cleveland, Ohio 44114

Robert L. Tucker
Hanna, Campbell & Powell, L.L.P.
3737 Embassy Parkway
Suite 100
Akron, Ohio 44333

**ATTORNEY FOR APPELLEE**

Gregory E. O'Brien
Cavitch, Familo & Durkin, L.P.A.
1300 East Ninth Street, 20th Floor
Cleveland, Ohio 44114

MARY EILEEN KILBANE, J.:

**{¶1}** Plaintiff-appellant, Sandra Sanders ("Sanders"), appeals from the jury's verdict in favor of defendant-appellee, Nationwide Mutual Insurance Company ("Nationwide"), and the trial court's grant of summary judgment in favor of Nationwide on Sanders's bad faith claim. For the reasons set forth below, we affirm.

**{¶2}** The underlying facts of this case were previously set forth by this court in Sanders's first appeal, *Sanders v. Nationwide Mut. Ins. Co.*, 8th Dist. Cuyahoga No. 95228, 2011-Ohio-1933, *discretionary appeal not allowed,* 130 Ohio St.3d 1416, 2011-Ohio-5605, 956 N.E.2d 308 ("*Sanders I*").

> On October 29, 2006, [Sanders's] home [and its contents were] destroyed by a fire. [Sanders] submitted a claim to Nationwide, who insured the home at the time. Nationwide made various payments on the claim and began an investigation into the fire. The investigation concluded that [Sanders's] 17-year-old son, W.S., intentionally set the fire in [Sanders's] house. On July 24, 2007, Nationwide notified [Sanders] that it was denying coverage of the claim, stating its reason for the denial as follows:
>
> "[W]e have concluded that the fire was caused intentionally by or at the direction of an insured and that the damage could reasonably have been expected to result from an insured's acts, or was the intended result from such acts, including criminal acts.
>
> Your Nationwide homeowner's policy form HO-34A states on page D1 as follows:
>
> Property Exclusions
>
> (Section I)
>
> 1. We do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another peril or

event contributed concurrently or in any sequence to cause the loss.

* * *

(g) Intentional Acts, meaning loss resulting from an act committed by or at the direction of an insured that may reasonably be expected to result from such acts, or is the intended result from such acts.   Intentional acts include criminal acts.   Such acts exclude coverage for all insureds."

On May 19, 2009, [Sanders] filed a complaint against Nationwide, alleging breach of contract and "bad faith tort."   On May 19, 2010, the trial court denied [Sanders's] motion for partial summary judgment and granted Nationwide's motion for summary judgment.

*Id*. at ¶ 2-10.

**{¶3}**   On appeal, we affirmed the denial of Sanders's motion for partial summary judgment and reversed the grant of Nationwide's motion for summary judgment.   *Id*. at ¶ 64.   In reversing the grant of Nationwide's summary judgment motion, we noted that: "an intentional act exclusion to insurance coverage will not apply 'where the insured was mentally incapable of committing an intentional act.'"   *Id*. at ¶ 34, quoting *Nationwide Ins. Co. v. Estate of Kollstedt*, 71 Ohio St.3d 624, 627, 1995-Ohio-245, 646 N.E.2d 816. We found that there was a genuine issue of material fact regarding whether W.S. was capable of forming the intent to damage Sanders's house by starting the fire.   *Id*. at ¶ 57. We reasoned, "the admission to arson at the juvenile court level is evidence — possibly even prima facie evidence — of intent in the insurance context, which creates a rebuttable presumption and shifts the burden to the other party to show lack of intent."   *Id.*

**{¶4}**   Following our remand, the parties continued with discovery, and the matter proceeded to a jury trial on Sanders's breach of contract claim.   The trial court bifurcated

Sanders's bad faith claim. Prior to trial, Sanders moved to exclude the testimony of Ralph Dolence ("Dolence"), Nationwide's expert on the issue of causation. The trial court held a *Daubert* hearing before trial to determine whether Dolence was permitted to testify to the origin of the fire.[1] At the conclusion of the hearing, the trial court overruled Sanders's objection and permitted Dolence to testify.

{¶5} At trial, Sanders testified that after her ex-husband died in January 2006, her son, W.S., was diagnosed with several mental illnesses, including grief reaction, anxiety disorder, adjustment disorder, depression, alcohol abuse, and drug abuse. Sanders also testified to several instances, prior to the fire, where she had to call the police because W.S. was either under the influence of drugs or alcohol and he injured himself, his sister, or he destroyed Sanders's personal property, including one instance where he lit small pieces of paper on fire and threw them around in the living room.

{¶6} Sanders testified that she returned home from work at approximately 4:00 a.m. on October 29, 2006, to find W.S., who was very intoxicated, in the living room with his friend. Sanders was not expecting him to be home because they had attended a Halloween party on the "east side." W.S. asked Sanders to get him something to eat from McDonald's. Sanders testified that she went to McDonald's and waited in the drive-thru line for 45 minutes because there was a problem with the speaker at the

---

[1] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court listed several factors to be considered in determining the reliability of scientific evidence. The Ohio Supreme Court adopted the *Daubert* standard in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 1998-Ohio-178, 687 N.E.2d 735.

drive-thru. Sanders testified that W.S. called her several times while she was at McDonald's. The calls became progressively more aggressive. W.S. was upset and did not believe that Sanders was still waiting in line at the drive-thru. He accused her of not loving him anymore. In one of the last conversations, W.S. called and asked Sanders if she had fire insurance. Sanders described W.S. as working himself into a rage. At that point, she decided to leave McDonald's and go to her girlfriend's house. While she was at her girlfriend's house, W.S. called her and told her the house was on fire. She rushed home to find her house on fire. W.S. told her that the fire started with a cigarette. A Nationwide agent asked her if she believed that W.S. accidentally started the fire. Sanders testified that she believed it was an accident, and W.S. was trying to harm something of hers. W.S. was taken to the hospital that night. W.S. was arrested the next day and subsequently charged with six counts of aggravated arson in juvenile court.

{¶7} W.S. testified that he had no recollection of events preceding the fire. His medical records from the hospital revealed that he had a blood alcohol concentration of .22, and marijuana, cocaine, and benzodiazepines in his system. W.S. testified that he pled guilty to an amended count of attempted arson in March 2007. The juvenile court adjudicated W.S. delinquent and nolled the remaining arson charges. W.S. testified that he pled guilty because at the time, it seemed like his only option to avoid "going to jail for years."

{¶8} Dolence, Nationwide's expert on the cause and origin of the fire, testified that he owns Dolence Electric Technical Consultants, a fire investigation company. His

company investigates fire origin and analyzes appliances and other possible sources of a fire. Dolence testified that he is a licensed private investigator in the field of fire investigations and certified with the International Association of Arson Investigators as a fire investigator and certified with the National Association of Fire Investigators as a fire and explosive investigator.

{¶9} Dolence is also a member of the National Fire Protection Association ("NFPA"), a national organization that published regulation standards and guidelines for fire investigation. Dolence testified that he has been in the business for approximately 30 years. Dolence testified that the NFPA publishes a recommended guideline called NFPA 921, "which outlines just about anything you can encounter in a fire." It is what most fire investigators use as a guideline and is what he used to investigate the fire at Sanders's home.

{¶10} Dolence opined, with a reasonable degree of scientific certainty, that the fire originated in the middle of the living room. Dolence testified that

> [t]hrough the process of our hypothesis, by the process of elimination, there was no natural item in that room that caused this fire. His conclusion was based on that, and based on "the readily available we call ordinary combustibles, someone or some * * * person or persons ignited ignitable materials or combustible materials in that room, deliberately setting this fire.

{¶11} He explained that

> [t]he fire was caused by a deliberate act that someone ignited a — combustibles readily available in that room. By that I mean papers, anything that was in that room that would burn that was not unique. No one brought in gasoline. Nobody brought in pallets. Nobody brought in things external to the location of that room and set them on fire.

**{¶12}** Dolence described the fire as

a hot, very hot fire, very fast fire. It was not characteristic of a slow, smoldering fire, which would be — an example would be a cigarette. If I lost a cigarette, first of all, if you drop a cigarette on a carpet, say in our room here, right in front of this gentleman, it would go out. Now, if your coat fell on it and insulated it, over a period of time it could smolder and the temperature would increase and increase to the point of igniting the coat or something combustible. It's a time duration thing. * * * [T]ime is a huge factor in considering if this was a cigarette or a careless smoking versus a fire that was fast and rapid, that burned very fast by the ignition of some material that spread[s.] * * * The temperature just soars. Until you get to a point that all the wall covering, all the furnishing, everything in the room about the same point in time reach the ignition temperature and it burst into flames. That's called flash over. This room, in fact, did flash over.

**{¶13}** As part of his investigation, Dolence checked the electrical system, the natural gas supply, hot water tank, furnace, the kitchen, and electrical appliances and did not find anything wrong with them.

**{¶14}** On cross-examination, Dolence testified that he did not know what the exact ignition source was, but stated that, "[i]t was not anything natural in that room." He further testified that he did not find any evidence or source of an open flame because the fire was a deliberate act. There were no heat sources from electricity or appliances that failed. Dolence testified that as part of his investigation, he ruled out all potential heat sources and potential ignition sources. He explained that

[o]rdinary combustibles [i.e., cardboard, books, papers, magazines] were the fuel load. I believe I told you that it was an ignition source that could be readily concealed [i.e., a lighter, matches] * * * or destroyed. You saw the condition of the room when we saw it. It's like finding a needle in the haystack. You don't find them all the time. You don't say undetermined because you can't find things. * * * [T]he other information we had about the threat to burn the house, to ask if you had fire insurance, the fact that he

was convicted in juvenile court for arson ought to have something to do with this. * * * [W.S.] admitted in a juvenile court that he set this fire. We found this out well after this fire. Basically says everything we're doing here today, that I was correct. This was a set fire. He admitted doing it.

{¶15} At the conclusion of trial, the jury returned a unanimous verdict for Nationwide. The trial court then returned Sanders's bad faith claim to the docket for disposition. Nationwide filed a motion for summary judgment, arguing that without coverage, there could be no breach of the duty of good faith. The trial court granted Nationwide's motion, noting that the motion was unopposed. The trial court found that "[t]he jury determined that Nationwide did not breach the contract and that Sanders was not entitled to coverage for the fire loss that occurred on October 29, 2006. [Sanders's] bad faith claim is therefore, dismissed as a matter of law."

{¶16} Sanders now appeals, raising the following five assignments of error for review, which shall be discussed together where appropriate.

### Assignment of Error One

The trial court erred in refusing to charge the jury that the voluntary intoxication of [W.S.] could be considered in determining whether he expected or intended to damage or destroy his mother's home.

### Assignment of Error Two

The trial court erred in admitting the testimony of Nationwide's cause-and-origin expert, Ralph Dolence.

### Assignment of Error Three

The trial court erred in charging the jury that Exclusion 1(g) applied if [W.S.'s] conduct was either intentional or criminal.

Assignment of Error Four

The trial court erred in refusing to submit jury interrogatories requested by [Sanders] that were essential to test the general verdict.

Assignment of Error Five

Because the trial court's judgment in Nationwide's favor on the breach of contract claim must be vacated or reversed, its judgment in Nationwide's favor on the bad faith claim must be vacated as well.

Jury Instructions

{¶17} In the first assignment of error, Sanders argues the trial court erred when it refused to charge the jury that W.S.'s voluntary intoxication is relevant in determining whether he intended to damage or destroy his mother's home. In the third assignment of error, Sanders argues the trial court erred when it charged the jury that Exclusion 1(g) applied if W.S.'s conduct was either intentional or criminal.

Standard of Review

{¶18} Requested jury instructions should ordinarily be given if they are correct statements of law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the specific instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). In Ohio, it is well established that the trial court will not instruct the jury where there is no evidence to support an issue. *Riley v. Cincinnati*, 46 Ohio St.2d 287, 348 N.E.2d 135 (1976), paragraph two of the syllabus.

{¶19} The exact language of a jury instruction is within the discretion of the trial court. *Youssef v. Parr, Inc.*, 69 Ohio App.3d 679, 690, 591 N.E.2d 762 (8th Dist.1990), citing *State v. Scott*, 41 Ohio App.3d 313, 535 N.E.2d 379 (8th Dist.1987), paragraph

three of syllabus. Therefore, "[w]hen reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *Harris v. Noveon, Inc.*, 8th Dist. Cuyahoga No. 93122, 2010-Ohio-674, ¶ 20, citing *Chambers v. Admr., Ohio Bur. of Workers' Comp.*, 164 Ohio App.3d 397, 2005-Ohio-6086, 842 N.E.2d 580 (9th Dist.). "An inadequate jury instruction that misleads the jury constitutes reversible error." (Citations omitted.) *Groob v. KeyBank*, 108 Ohio St.3d 348, 355, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 32.

### Voluntary Intoxication

{¶20} Sanders first argues that the trial court committed reversible error when it instructed the jury on voluntary intoxication. She proposed the following instruction: "evidence of voluntary intoxication is relevant in determining the presence or absence of intent with reference to an exclusion clause." The trial court denied her request and charged the jury that:

> Voluntary intoxication does not negate one's intentional acts and cannot be used as a complete defense to any exclusion in an insurance policy for the intentional acts of an insured.

> If [Sanders] has not proved by clear and convincing evidence that her son was mentally incapable of committing an intentional act, then the provision of the policy which excludes coverage because the loss was the intended result of an act committed by an insured applies, and you must enter a verdict in favor of [Nationwide] on [Sanders's] breach of contract claim.

> On the other hand, if [Sanders] has proven by clear and convincing evidence that her son was mentally incapable of committing an intentional act, then the provision of the policy which excludes coverage because the loss was the intended result of an act committed by an insured does not

apply. In that event, you must render a verdict in favor of [Sanders] on her breach of contract claim[.]

{¶21} Sanders argues that this jury instruction "deprived the jury of the ability to consider W.S.'s voluntary intoxication on the question of his ability to formulate intent." Public policy in Ohio, however, prohibits wrongdoers from utilizing insurance to avoid liability for intentional criminal conduct and intentional infliction of bodily injury to another. *Grange Mut. Cas. Co. v. Gore*, 12th Dist. Warren No. 96-08-076, 1997 Ohio App. LEXIS 1985, *8 (May 12, 1997), citing *Gearing v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 665 N.E.2d 1115 (1996); *Preferred Mut. Ins. Co. v. Thompson*, 23 Ohio St.3d 78, 491 N.E.2d 688 (1986). An "expected or intended injury exclusion" prevents individuals from using insurance in such a manner. *Preferred Mut. Ins. Co.* at 81.

{¶22} Moreover, an insured's intoxication is of no consequence in determining whether a policy exclusion for intentional injuries applies. *Bodager v. Chapman*, 6th Dist. Ottawa No. OT-94-031, 1995 Ohio App. LEXIS 861, *11 (Mar. 3, 1995). In *Bodager*, the Sixth District Court of Appeals found the following language from *Prudential Property & Cas. Ins. Co. v. Kerwin*, 215 Ill. App.3d 1086, 576 N.E.2d 94 (1991), to be persuasive:

> Plainly, in civil cases it would be against public policy to relieve citizens of the consequences of their acts based upon their voluntary intoxication. It follows that an insured cannot be heard to argue that he did not intend to do an otherwise intentional act on the basis that he was voluntarily intoxicated and thereby claim coverage under an insurance policy that excludes coverage for intentional acts. The law cannot be perverted to reach a result which would be inimical to public policy.

*Id.* at *11-12.

**{¶23}** In the instant case, the jury instruction given by the trial court, when taken in its entirety, fairly and correctly stated the law applicable to the evidence presented at trial. *See Sivit v. Village Green of Beachwood L.P.*, 8th Dist. Cuyahoga No. 98401, 2013-Ohio-103, ¶ 40, *discretionary appeal not allowed*,136 Ohio St.3d 1404, 2013-Ohio-2645, 989 N.E.2d 1019, citing *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 629 N.E.2d 500 (9th Dist.1993). Therefore, we find that the trial court properly instructed the jury on voluntary intoxication.

**{¶24}** The first assignment of error is overruled.

Exclusion 1(g)

**{¶25}** Sanders next argues the trial court erred when it instructed the jury that Exclusion 1(g) of the policy applies if W.S.'s conduct was either criminal or intentional. The trial court instructed the jury, with respect to the exclusion, as follows:

> Subsection G is intentional acts, meaning loss resulting from an act committed by or at the direction of an insured — these are all in the disjunctive — that may reasonably be expected to result from such acts, or is the intended result from such acts. Intentional acts include criminal acts. Such acts exclude coverage for all insureds.
>
> * * *
>
> [Nationwide] contends that the house fire that resulted in the property loss at issue was the result of an intentional or criminal act committed by [Sanders's] son, an insured under the policy.
>
> * * *
>
> [Sanders's] son's juvenile adjudication of attempted aggravated arson is evidence of and can be considered by you in determining whether [W.S.'s] conduct constitutes an intentional act or a criminal act.

If you find that [Nationwide] did not prove by a preponderance of the evidence that the property loss at issue was the result of an intentional act or a criminal act committed by an insured under the policy, then the defendant has not met its burden of proof and the exclusion does not apply. You must render a verdict in favor of [Sanders] on her breach of contract claim if that be your finding.

On the other hand, if you find that [Nationwide] did prove by a preponderance of the evidence that the property loss at issue could reasonable be expected to result from an act committed by the insured, you must render a verdict in favor of [Nationwide] on [Sanders's] breach of contract claim.

Likewise, if you find that [Nationwide] proved by a preponderance of the evidence that the property loss at issue was the result of a criminal act committed by the insured, you must render a verdict in favor of [Nationwide] on [Sanders's] breach of contract claim.

**{¶26}** Sanders argues this charge is erroneous because (1) W.S. was adjudicated delinquent, not convicted of a crime; and (2) the exclusion does not state that "all criminal acts shall conclusively be deemed to be intentional acts." We disagree.

**{¶27}** Exclusion 1(g) defines "intentional act" to include a "criminal act," not "conviction of a crime" as Sanders contends. The court charged the jury that the W.S.'s juvenile adjudication "can be considered by you in determining whether [W.S.'s] conduct constitutes an intentional act *or* a criminal act." (Emphasis added.) In *Sanders I*, we found that "W.S.'s juvenile adjudication of attempted arson was admissible to show his intent." *Id*., 8th Dist. Cuyahoga No. 95228, 2011-Ohio-1933, ¶ 27, citing *Black v. Richards*, 5th Dist. Perry Nos. 08 CA 19, 09 CA 4, 09 CA 12, and 09 CA 13, 2010-Ohio-2938 (holding that the insured's adjudication of delinquency after admitting to "complicity to engage in arson * * * is sufficient to trigger the intentional acts exclusion"

under the insurance policy); *Horace Mann Cos. v. Harris*, 12th Dist. Madison No. CA96-11-051, 1997 Ohio App. LEXIS 3646 (Aug. 11, 1997) (holding that "[a]n insurer may avoid providing coverage or a defense for a juvenile insured where the insurer establishes that the juvenile insured has been adjudicated delinquent").

{¶28} Sanders further argues that Exclusion 1(g) does not exclude damage caused by "intentional acts or criminal acts." Rather, she claims that the exclusion "requires that the insured's act — whether 'criminal' or not — leads to a loss that may 'reasonably be expected to result from such acts, or as the intended result from such acts.'" As a result, Sanders argues the court deprived the jury of the opportunity to consider whether intoxication precluded W.S. from the ability to form such an expectation or intent. The jury interrogatories, however, disprove Sanders's argument. In the instant case, the jury's interrogatory answers indicated that W.S. had intended to both cause the fire and the resulting damage. Therefore, we find that the trial court properly instructed the jury on Exclusion 1(g).

{¶29} Accordingly, the third assignment of error is overruled.

### Testimony of Ralph Dolence

{¶30} In the second assignment of error, Sanders argues the trial court erred in admitting Dolence's trial testimony regarding the cause and origin of the fire, including his opinion that the fire was intentionally set. Specifically, Sanders contends that because Dolence was unable to identify the ignition source, he should not have been able to opine that the fire was intentionally set.

**{¶31}** We note that "[t]he determination of the admissibility of expert testimony is within the discretion of the trial court. Evid.R. 104(A). Such decisions will not be disturbed absent abuse of discretion. *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 616, 1998-Ohio-178, 687 N.E.2d 735." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9. In *State v. Nemeth*, 82 Ohio St.3d 202, 207, 1998-Ohio-376, 694 N.E.2d 1332, the Ohio Supreme Court noted that "[c]ourts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met."

**{¶32}** Evid.R. 702, which governs expert testimony, provides in pertinent part:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

**{¶33}** A trial court examines whether the expert's conclusion is based on scientifically valid principles and methods when determining whether the opinion of an expert is reliable under Evid.R. 702(C). *Valentine* at 44, citing *Miller*. In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has

gained general acceptance. *Miller* at 611, citing *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

{¶34} A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial. *Valentine* at 44. Moreover, evidence should not be excluded merely because it is questionable or confusing, since the experts' opinions would be subject to cross-examination and the credibility of their conclusions left to the trier of fact. *Miller* at 614.

{¶35} This court addressed an analogous situation in *Gilmore v. Village Green Mgt.*, 178 Ohio App.3d 294, 2008-Ohio-4566, 897 N.E.2d 1142 (8th Dist.). In *Gilmore*, plaintiff-Gilmore appealed the trial court's judgment that partially granted defendant-Village Green's motion to exclude plaintiff-expert Dolence's, opinion regarding a fire at the Village Green apartments. In a May 2004 report, Dolence concluded that the fire originated in the floor space below level 3 and the ceiling space above level 2 of Building 3. He noted, however, that

> "the exact fire cause and mode of failure will probably never be identified due to the destruction of the site and pertinent evidence," he nonetheless concluded, relying upon facts in evidence and the elimination of all other potential causes, that the cause of the fire was an electrical fault in the floor and ceiling space between levels 2 and 3 of Building 3.

*Id.* at ¶ 4.

{¶36} In a July 2005 report, Dolence "opined that missing wooden beams and negligent installation of the electrical feeder cables and wires caused the fire to occur and then rage out of control." Although Dolence identified other potential factors that could

have contributed to the cause of the fire, including water deterioration and water infiltration, he nonetheless specifically concluded that

> "the only feasible ignition source in this ceiling and floor area was the electrical wiring and wiring devices and the wiring junction and splice points." Dolence again noted that "the total and devastating destruction of the section of the building where the fire originated makes it impossible for anyone to pinpoint the exact point and mode of failure."

*Id.* at ¶ 5.

{¶37} Village Green moved to exclude Dolence's testimony under Evid.R. 702, arguing that his opinions were merely speculative and could not meet the standards for admissibility of *Daubert*. The trial court held a *Daubert* hearing, at which Dolence testified that

> he followed the scientific method described in the [NFPA 921], a multi-step process that guides fire investigators through fire investigations using both inductive and deductive reasoning, in conducting his investigation. He testified that he conducted a physical examination of the site, collected evidence, formed a hypothesis, and then tested that hypothesis.

*Id.* at ¶ 7. The trial court held that

> [Village Green's] motion in limine seeking to exclude Dolence's testimony is denied. Dolence's opinion that the fire was electrical in origin may be admitted. Mr. Dolence's next conclusion — that the electrical problem causing the fire was necessarily the result of sloppy construction practices in running and fixing the electrical wires through the flooring braces — goes too far. It is an inference based upon an earlier inference. Mr. Dolence first infers the electrical origin of the fire and then infers the electrical problem stemmed from defective construction. This is impermissible. Mr. Dolence may only testify to the fire being electrical in origin.

*Id.* at ¶ 11.

{¶38} The trial court further held that Dolence's opinion "'that the fire was caused

by specific defects in the electrical wiring similar to those found in unburned parts of the building is too speculative to be heard by the jury.'" *Id.* at ¶ 12.

{¶39} On appeal, we reversed the trial court's judgment with respect to Dolence's testimony and concluded that

> [b]y using the deductive reasoning cited in the NFPA 921, Dolence systemically eliminated other potential causes of the fire such as arson, inadvertent negligence such as careless smoking, furnace failure, or a potted plant on a first floor patio. It was through this method of deductive reasoning that Dolence concluded that the sole possible cause of the fire was electrical in nature, and that the cause of the electrical fire was due to negligent construction. Specifically, Dolence testified that (1) the open-web floor joist system used by the Village in constructing the building caused the fire to spread "totally [un]encumbered"; (2) that the gusset plates used to hold the wood slats in place were not cut to fit the specific needs of the 2x4's; (3) multiple electric feeder cables were placed under a single staple, which violates applicable building codes; and (4) multiple electric feeder cables were installed against the metal gusset plates which causes "resistance heating" and leads to fires. While Dolence admitted that water deterioration and oxidation "could" have contributed to the problem, he still opined, with a reasonable degree of scientific certainty, that faulty installation of the wiring was the cause of the electrical fire.

> Contrary to the trial court's finding, we do not find that Dolence's conclusion that negligent construction caused the electrical fire was merely "speculative" or "an inference based upon an inference." His finding that the fire was electrical in nature is based on the scientific method established by the NFPA 921. Specifically, Dolence came to this conclusion based on his own observations, data collected, documents reviewed, witness accounts, and because he had ruled out all other possibilities.

*Id.* at ¶ 30-31.

{¶40} Similarly, in the instant case, Dolence testified that the fire originated in the middle of the living room. He then made a determination as to the cause of the fire from this area of origin. Dolence stated that

[t]hrough the process of our hypothesis, by the process of elimination, there was no natural item in that room that caused this fire. The conclusion was based on that, and based on the readily available ordinary combustibles that someone or some * * * person or persons ignited ignitable materials or combustible materials in that room, deliberately setting this fire.

He described the fire as "a hot, very hot fire, very fast fire. It was not characteristic of a slow, smoldering fire, which would be — an example would be a cigarette."

**{¶41}** Dolence opined, with a reasonable degree of scientific certainty, that

[t]he fire was caused by a deliberate act that someone ignited a — combustibles readily available in that room. By that I mean papers, anything that was in that room that would burn that was not unique. No one brought in gasoline. Nobody brought in pallets. Nobody brought in things external to the location of that room and set them on fire.

He reached this conclusion by personally inspecting the fire site, examining the evidence and speaking with Sanders. As part of his investigation, which complied with the NFPA 921, Dolence systematically eliminated other potential causes of fire such as the electrical system, the natural gas supply, hot water tank, furnace, the kitchen, and electrical appliances. While Dolence acknowledged that he could not determine the exact ignition source, he still opined that the fire was intentionally set.

**{¶42}** We are mindful that

[t]he court's role as gatekeeper does not focus upon the conclusions that an expert draws. *Hertzfeld v. Hayward Pool Prod., Inc.*, 6th Dist. Lucas App. No. L-07-1168, 2007-Ohio-7097. When a competing expert points out weaknesses in the strength of an expert's conclusion, it does not turn the challenged expert's conclusion into the type of "subjective belief or unsupported speculation," which *Daubert* prohibits. *Id.*

*Gilmore,* 178 Ohio App.3d 294, 2008-Ohio-4566, 897 N.E.2d 114, at ¶ 33.

**{¶43}** Accordingly, the second assignment of error is overruled.

<u>Jury Interrogatories</u>

**{¶44}** In the fourth assignment of error, Sanders argues the trial court erred when it refused to submit the jury interrogatories she requested, and as a result, she is entitled to a new trial. She contends that answers to the interrogatories she proposed would have allowed her the ability to determine whether the jury's verdict was based on a finding that W.S.'s conduct was "intentional" or "criminal."

**{¶45}** Civ.R. 49(B) allows for interrogatories in conjunction with the general verdict. The rule provides in pertinent part that

> [t]he court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

**{¶46}** The Ohio Supreme Court has stated that "[a]lthough Civ.R. 49(B) mandates the submission of requested interrogatories, the court still has the discretion to reject interrogatories that are ambiguous, confusing, redundant, or otherwise legally objectionable." *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 259, 1996-Ohio-159, 662 N.E.2d 1, citing *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 1992-Ohio-109, 592 N.E.2d 828. "Proper jury interrogatories must address determinative issues and must be based upon trial evidence." *Ramage* at 107; *see also Ragone v. Vitali & Beltrami, Jr., Inc.*, 42 Ohio St.2d 161, 165-166, 327 N.E.2d 645

(1975) ("[a]uthority is still vested in the judge to control the substance and form of the questions, and if the interrogatories are not based on the evidence, are incomplete, ambiguous or otherwise legally objectionable, the judge need not submit them to the jury.")

{¶47} "The standard under which we review a trial court's decision whether to submit a proposed interrogatory is abuse of discretion." *Freeman v. Norfolk & W. Ry.*, 69 Ohio St.3d 611, 614, 1994-Ohio-326, 635 N.E.2d 310, citing *Ragone*, at paragraph one of the syllabus.

{¶48} In the instant case, Sanders submitted four interrogatories and Nationwide submitted seven. Sanders's first interrogatory addressed the same issue as Nationwide's fifth interrogatory — was the fire intentionally set? Sanders's second interrogatory addressed the same issue as Nationwide's second interrogatory — did W.S. set the fire? Sanders's third interrogatory was duplicative, in part, of her first two interrogatories and addressed the same issues as Nationwide's third and fifth interrogatories — was the damage expected or intended? Sanders's fourth interrogatory addressed the same issue in Nationwide's sixth interrogatory — did W.S. suffer from a derangement of his intellect, which deprived him of the capacity to govern his conduct?

{¶49} A review of the record reveals that the trial court reviewed both sets of interrogatories and elected to submit Nationwide's interrogatories. The court stated, "[Sanders's] interrogatories are noted. I think that they're adequately covered by those submitted by [Nationwide.]" We agree with the trial court.

**{¶50}** Therefore, based on the foregoing, we cannot say that the trial court's refusal to submit Sanders's proposed interrogatories was an abuse of discretion. It was within the trial court's discretion to elect to submit Nationwide's interrogatories when both sets addressed the same issues.

**{¶51}** Accordingly, the fourth assignment of error is overruled.

Reversal of Bad Faith Claim

**{¶52}** In fifth assignment of error, Sanders argues that since the trial court's judgment in Nationwide's favor on the breach of contract claim should be reversed, its judgment in favor of Nationwide on the bad faith claim should also be reversed.

**{¶53}** Here, Nationwide moved for summary judgment after the jury returned a verdict in its favor on the breach of contract claim. Nationwide argued if there was no breach of the underlying contract, there could be no bad faith. The trial court agreed, finding that "[t]he jury determined that Nationwide did not breach the contract and that Sanders was not entitled to coverage for the fire loss that occurred on October 29, 2006. [Sanders's] bad faith claim is therefore, dismissed as a matter of law."

**{¶54}** In *Bob Schmitt Homes, Inc. v. Cincinnati Ins. Co.*, 8th Dist. Cuyahoga No. 75263, 2000 Ohio App. LEXIS 659 (Feb. 24, 2000), this court found that the plaintiff could not make a bad faith claim when the plaintiff failed to satisfy its burden of showing that it is entitled to coverage. *Id.* at 13. Likewise, in the instant case, since the initial factual prerequisite to Sanders's bad faith claim is lacking, summary judgment in favor of Nationwide was appropriate.

**{¶55}** The fifth assignment of error is overruled.

**{¶56}** Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

SEAN C. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR