[Cite as *Blinn v. Balint*, 2014-Ohio-3114.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | | |
|---|---|---|
| ROBERT BLINN | | C.A. No. 26733 |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| MARK A. BALINT | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellee | | CASE No. CV 2011 01 0608 |

DECISION AND JOURNAL ENTRY

Dated: July 16, 2014

BELFANCE, Judge.

**{¶1}** Plaintiff-Appellant Robert Blinn appeals following a jury trial in the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

**{¶2}** On November 17, 2007, Defendant-Appellee Mark Balint was exiting a parking lot and making a left-hand turn when the vehicle he was driving struck Mr. Blinn's vehicle. Immediately following the accident, Mr. Blinn did not believe he suffered any injury; however, later that day, Mr. Blinn began to experience pain in his left shoulder. Ultimately, Mr. Blinn was diagnosed with a tear in his left rotator cuff. Mr. Blinn later underwent two surgeries in an effort to rectify the problem.

**{¶3}** Mr. Blinn initially filed a complaint in Summit County Court of Common Pleas that he dismissed without prejudice on May 17, 2010. Mr. Blinn re-filed his complaint against Mr. Balint and several insurance companies on January 31, 2011. Mr. Blinn alleged that Mr.

Balint was negligent and alleged additional claims involving the insurance companies. The insurance companies were subsequently dismissed from the action.

{¶4} Ultimately, the matter proceeded to a jury trial. After Mr. Blinn presented his case, the trial court granted a directed verdict in favor of Mr. Blinn concluding that Mr. Balint was at fault for the accident. Thus, the central issue before the jury was whether Mr. Blinn's rotator cuff tear was caused by the accident or whether it pre-existed the accident. The jury found in favor of Mr. Blinn and awarded him $200. Mr. Blinn has appealed, raising three assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN PERMITTING BALINT'S MEDICAL EXPERT TO RENDER OPINIONS WHEN THE OPINIONS WERE NOT SUPPORTED BY FACTS OR DATA PERCEIVED BY THE EXPERT OR ADMITTED IN EVIDENCE IN CONTRAVENTION OF EVID.R. 703 AND 705.

{¶5} Mr. Blinn asserts in his first assignment of error that the trial court erred in permitting Mr. Balint's expert, Dr. Timothy Gordon, M.D., to render an expert opinion when Dr. Gordon's opinion was based on facts or data not perceived by him or admitted into evidence in violation of Evid.R. 703 and 705.

{¶6} "The determination of the admissibility of expert testimony is within the discretion of the trial court. Such decisions will not be disturbed absent abuse of discretion." (Internal citation omitted.) *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. "'Abuse of discretion' suggests unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court to substitute its judgment for that of the trial court." *Id.*

{¶7} Evid.R. 705 provides that "[t]he expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." Under Evid.R. 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Evid.R. 703. "It is important to note that Evid.R. 703 is written in the disjunctive. Opinions may be based on perceptions or facts or data admitted in evidence." (Emphasis omitted.) *State v. Solomon,* 59 Ohio St.3d 124, 126 (1991). In *Solomon,* the Supreme Court concluded that, "[w]here an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." *Id.* at syllabus. This Court has taken *Solomon* to mean that "[a]s long as an expert bases an opinion at least in major part on facts or data perceived by him or admitted into evidence Evid.R. 703 has been satisfied." *Farkas v. Detar,* 126 Ohio App.3d 795, 798 (9th Dist.1998). "Thus, an expert witness may base an opinion solely on evidence admitted at trial." (Internal quotations and citation omitted.) *State v. Jewett,* 10th Dist. Franklin No. 11AP-1028, 2013-Ohio-1246, ¶ 80. Other appellate courts have concluded that, so long as the information contained in the reports relied on by the experts is admitted in some manner at trial (i.e. via testimony), then admission of the reports themselves is not necessary for compliance with Evid.R. 703. *See id.* at ¶ 81 (discussing a case from the Second District). This Court has stated that it is the objecting party's burden to demonstrate that, in forming his or her opinion the expert relied primarily on facts or data not perceived by the expert or not properly admitted into evidence. *See Farkas* at 801; *see also* Evid.R. 703.

{¶8} At trial, the central issue before the jury was whether Mr. Blinn's rotator cuff injury pre-existed the accident. Mr. Blinn asserted that the tear in his shoulder occurred as a

result of the accident whereas Mr. Balint claimed that Mr. Blinn already had a tear in his left shoulder prior to the accident. In addition to his own testimony, Mr. Blinn presented testimony of his two treating physicians, Dr. Mark Pluskota, his primary care physician, and Dr. Steve Lippitt, the orthopedic surgeon who performed the shoulder surgeries. During his testimony, Dr. Pluskota described Mr. Blinn's history of shoulder pain and treatment dating back to December 1993. Dr. Pluskota diagnosed the problem as myositis and myalgia which he described as somewhat nonspecific terms that indicate some inflammation and pain in a muscle. In February 2005, Mr. Blinn experienced similar shoulder pain. In January 2007, Mr. Blinn reported left shoulder pain and Dr. Pluskota ordered an x-ray. Neither the x-ray nor the report of the radiologist who interpreted the x-ray results was admitted at trial. However, Dr. Pluskota discussed the report during his testimony and his impression was that the x-ray result was fairly benign. Mr. Blinn continued to have shoulder pain in February 2007. He was given a diagnosis of joint pain in the shoulder and his treatment was an injection of cortisone and anesthetic medicine into the shoulder joint. Dr. Pluskota was asked about the x-ray report findings and explained some of the terminology and import of the findings.[1] In August 2007, Mr. Blinn returned to Dr. Pluskota due to left shoulder pain. Dr. Pluskota did not believe there was any evidence of a torn rotator cuff at that time, and Mr. Blinn was given a cortisone injection in the left shoulder.

---

[1] For example, Dr. Pluskota was asked about the meaning of the finding: "'[t]he acromioclavicular joint and glenohumeral joint appear fairly well maintained.'" He responded that it means "the joints of the shoulder looked good. There was no narrowing or widening of the joints, they were in a normal position." He also explained that the x-ray report's statement that "[t]he subhumeral space is normal in configuration" meant that "the space between the ball and socket was normal. There's no evidence of joint narrowing that you would see in arthritis."

{¶9} Dr. Lippitt's first encounter with Mr. Blinn was in January 2008. Referring to the impressions contained in the January 2008 MRI report, Dr. Lippitt described the nature of the tear present in Mr. Blinn's tendon.[2] In addition, he read the 2007 x-ray report into the record, which stated in part that there was "'minimal spurring along the greater tuberosity of the humeral head.'" Dr. Lippitt testified that such a finding could be "an x-ray objective finding of cuff disease in general, [but] not more specific to a cuff tear." Dr. Lippitt opined that Mr. Blinn's rotator cuff tear was caused by the car accident.

{¶10} Mr. Balint presented the testimony of Dr. Gordon. Dr. Gordon indicated that, in forming his opinion, he reviewed the records of Dr. Pluskota, Dr. Lippitt, Akron General Hospital, Barberton Citizens Hospital, the MRI scans of Mr. Blinn's shoulder, the traffic crash reports, a report from Dr. Lippitt, and "some therapy records[.]" He indicated that he reviewed records from both before and after the accident; however, he did not examine Mr. Blinn, nor, as noted above, did he review the actual x-ray from January 2007.

{¶11} Dr. Gordon testified that the rotator cuff is a group of muscles that become tendons and attach on the greater tuberosity of the humerus. One of those tendons, the supraspinatus tendon, is the most commonly torn in a rotator cuff injury. He indicated that "th[e rotator cuff] muscles allow the function of the shoulder to be enhanced and keep the shoulder [] stable and those kind of things." He also discussed the things that could cause rotator cuff tears. While he indicated that injuries, such as falling, and heavy lifting could cause tears, he stated

---

[2] Dr. Lippitt described the impression in the MRI report as "'full-thickness tear of anterior fibers of the supraspinatus tendon at enthesis with severe tendinosis of the torn tendon edges. No significant disproportionate muscle atrophy is present. Mild glenohumeral joint osteoarthritis.'"

that, the most common cause was an impingement process caused by arthritic changes. According to Dr. Gordon, the arthritic changes cause impingement which causes the rotator cuff to become worn during movement. He stated that, as the muscle/tendon is being worn, it will ultimately tear at its insertion at the greater tuberosity of the humerus. Dr. Gordon testified, "[C]ommonly [one would] see degenerative changes present right at the greater tuberosity where the rotator cuff attaches to the bone, and [one would] see some bone spurs there."

{¶12} While Dr. Gordon did not examine Mr. Blinn, he did look at his medical records.[3] Dr. Gordon testified that Mr. Blinn had been evaluated on multiple occasions for left shoulder pain, dating back to 1993. He testified that it was significant that, in January 2007, Mr. Blinn came in to see Dr. Pluskota, that x-rays were obtained, and that the radiologist reported "spurring, meaning osteophytes, bone spurs, at the greater tuberosity of the humeral head." Dr. Gordon noted that the supraspinatus tendon attaches on the greater tuberosity and that that is where the bone spurs were. He stated that "in [his] experience clinically, that goes along with a rotator cuff tear being present there." Dr. Gordon testified that there was further evidence of a tear given Mr. Blinn's August 2007 examination, which was "consistent with the idea of him having a rotator cuff tear at that time." Dr. Gordon noted that Mr. Blinn's symptoms included tenderness when the doctor palpated the anterior aspect of the shoulder where the tear was later identified in the MRI and that his symptoms were "classic symptoms of a rotator cuff tear." Additionally, Mr. Blinn's range of motion was decreased and he had a "painful arc of 120

---

[3] We note that the transcript is less than clear as to how much of Mr. Blinn's medical records were actually admitted as an exhibit. Initially, it appeared that all of them were, but then, near the end of the transcript, additional objections were raised and it appears much of the records were withdrawn. However, in their briefs, the parties appear to be in agreement that the records in Defendant's Exhibit A were admitted, which included the medical records regarding Mr. Blinn's exams for his left shoulder. We will proceed under the assumption that those were the only records admitted at trial.

degrees[]" both of which were consistent with a rotator cuff tear. Dr. Gordon also noted that the fact that Mr. Blinn had normal strength in his shoulder was also consistent with a small rotator cuff tear, which was how Dr. Gordon characterized the tear seen on the 2008 MRI. Dr. Gordon also discussed the significance of Mr. Blinn's first examination following the accident and found it significant that Mr. Blinn was able to lift his arm to 160 degrees. He opined that Mr. Blinn could not have lifted his arm to 160 degrees if he had just sustained a tear. Ultimately, Dr. Gordon opined that Mr. Blinn did not sustain the tear as a result of the accident.

{¶13} Mr. Blinn's challenges to the propriety of Dr. Gordon rendering an opinion primarily center around: (1) the fact that the MRI was not admitted into evidence; (2) the fact that Dr. Gordon did not review the 2007 x-ray; and (3) the fact that he made conclusions about Mr. Blinn's condition based upon the radiologist's findings from that x-ray and made statements about the x-ray itself despite not having seen it. We note that these are the only facts or data that Mr. Blinn contends were not perceived by Dr. Gordon or admitted into evidence. Our analysis will be limited accordingly.

{¶14} Initially, Mr. Blinn asserts that Dr. Gordon could not testify about the MRI because it was not admitted into evidence. Dr. Gordon stated that he viewed the MRI films taken in January 2008 after Mr. Blinn's accident. Whereas other symptoms could be highly indicative of a cuff tear, Dr. Gordon stated that the MRI is the "gold standard" in definitively diagnosing a rotator cuff tear. In reaching his opinion that Mr. Blinn's tear existed prior to the accident, Dr. Gordon relied heavily upon what he observed in the MRI. He stated that, in looking at the MRI, there was significant impingement on the rotator cuff and that the impingement he observed had been there much longer than two months.

{¶15} There is no dispute that the MRI was not admitted into evidence; however, as noted above, Evid.R. 703 is written in the disjunctive. Thus, the issue presented is whether the MRI was perceived by Dr. Gordon within the meaning of Evid.R. 703. In his merit brief, Mr. Blinn suggests that the fact that Dr. Gordon personally viewed the MRI itself was not sufficient to constitute perception under the rule.

{¶16} We note that the cases that Mr. Blinn cites are not precisely on point, as the vast majority deal with an expert's opinion being inadmissible due to the expert's reliance on written reports of third persons and the failure to admit those writings at trial. *See, e.g., State v. Jones,* 9 Ohio St.3d 123, 124-125 (1984); *In re C.S.,* 9th Dist. Summit No. 25344, 2010-Ohio-4463, ¶ 41-42; *In re Sherman,* 3d Dist. Hancock Nos. 05-04-47, 05-04-48, & 05-04-49, 2005-Ohio-5888, ¶ 19. These cases present situations where the expert has relied upon written reports detailing facts which the expert has not personally perceived and which are themselves hearsay. None deal with an expert who has viewed an MRI or an x-ray that was not admitted into evidence.

{¶17} This Court's own research, however, has revealed cases from two of our sister districts which have concluded that an expert who has personally looked at an x-ray has perceived the item as contemplated by Evid.R. 703. *See Caputo v. Silver Arrow Sys.*, 8th Dist. Cuyahoga No. 72620, 1997 WL 675433, *2 (Oct. 30, 1997) (expert perceived x-ray that was not admitted into evidence); *Turner v. Navistar Internatl. Transp. Corp.,* 2d Dist. Clark No. 2701, 1991 WL 26686, *3 (Feb. 25, 1991) ("Since Dr. Miller interpreted the x-rays themselves instead of just relying upon the radiologist's report, she was basing her opinion upon facts she personally perceived. Therefore, her opinion was admissible under Evid.R. 703."). We agree with the rationale of these cases. X-rays and MRIs are unlike other medical records or writings which merely record someone else's observations and are an interpretation of events or facts. Viewing

an MRI is akin to examining a patient. The expert is viewing the tangible data and facts concerning the person's physical condition, not some other person's interpretation of them. Accordingly, we conclude that an expert's personal examination of an MRI satisfies the perception requirement of Evid.R. 703.

{¶18} Mr. Blinn also suggests that Dr. Gordon improperly rendered his opinion in contravention to Evid.R. 703 because Dr. Gordon based his opinion in part upon the 2007 x-ray report containing the findings of the radiologist. The 2007 x-ray findings were discussed by Dr. Pluskota, Dr. Lippitt, and Dr. Gordon. It is true that the report itself was not admitted into evidence. However, during questioning about the x-ray report, Dr. Lippitt read the report into evidence and then proceeded to answer questions. Assuming that Dr. Gordon based his opinion in large part upon the x-ray report, Mr. Blinn has not explained how Evid.R. 703 was violated given the fact that contents of the report was admitted via testimony.

{¶19} Mr. Blinn also asserts that Dr. Gordon specifically stated that "there was bone spurring where the supraspinatus tendon attached to the greater tuberosity[,]" and that this statement by Dr. Gordon amounts to him making a conclusion that was outside the findings of the x-ray report, because the x-ray report does not specifically state where along the greater tuberosity the spurring is located. First, we note that pages of the transcript cited by Mr. Blinn do not evidence that those precise words were said. Instead, Dr. Gordon testified that

> the radiologist reported that there was spurring, meaning osteophytes, bone spurs, at the greater tuberosity of the humeral head. And remember, we talked about that a little bit before, the idea that where the rotator cuff attaches, the supraspinatus tendon specifically in this case we're talking about, is on the greater tuberosity. So some months before the accident, the X-rays showed these bone spurs right here. And in my experience clinically, that goes along with a rotator cuff tear being present there. So that was before the accident.

{¶20} While it is possible to conclude that that is the import of Dr. Gordon's testimony, Dr. Gordon never states precisely what Mr. Blinn alleges he does. Dr. Gordon's testimony is somewhat ambiguous. It could be equally possible that Dr. Gordon could have been stating that, because there was spurring in the general area of the greater tuberosity and the supraspinatus tendon attaches on the greater tuberosity, such would support a conclusion that the tear was there at that point in time.

{¶21} However, even assuming that Dr. Gordon impermissibly made a finding that was beyond what was capable of being known based solely upon the x-ray findings, Dr. Gordon did not base his conclusion that Mr. Blinn had a pre-existing rotator cuff tear in whole or in major part upon the x-ray report and his interpretation of what that report meant, as evidenced by the other testimony in the record. Thus, we cannot conclude that the trial court should have excluded Dr. Gordon's expert opinion pursuant to Evid.R. 703 in light of Dr. Gordon's testimony concerning the 2007 x-ray report.[4]

{¶22} Mr. Blinn also argues that Dr. Gordon was erroneously permitted to render his opinion because he made conclusions about Mr. Blinn's condition based upon the 2007 x-ray that was neither viewed by Dr. Gordon nor admitted into evidence. As already described, while Dr. Gordon did not examine Mr. Blinn, he did look at his medical records. Dr. Gordon testified that Mr. Blinn had been evaluated on multiple occasions for left shoulder pain, dating back to 1993. He testified that it was significant that in January 2007, Mr. Blinn came in to see Dr. Pluskota, that x-rays were obtained, and that the radiologist reported "spurring, meaning osteophytes, bone spurs, at the greater tuberosity of the humeral head." Dr. Gordon noted that

---

[4] To the extent that Mr. Blinn complains about the trial court's failure to sustain Mr. Blinn's particular objections to the admission of Dr. Gordon's testimony, such is beyond the stated assignment of error.

the supraspinatus tendon attaches on the greater tuberosity and that that is where the bone spurs were. He stated that "in [his] experience clinically, that goes along with a rotator cuff tear being present there."

{¶23} However, Dr. Gordon's testimony was not limited to discussion of the x-ray findings. As noted above, Dr. Gordon testified that the exam findings on Mr. Blinn's August 28, 2007 visit to Dr. Pluskota were "very consistent" with Mr. Blinn having a rotator cuff tear at that time, and he related its significance in light of Dr. Pluskota's first exam of Mr. Blinn following the accident. Dr. Gordon testified that

> [F]our days after the accident, Dr. Pluskota examined [Mr. Blinn]. He had left shoulder pain. He had tenderness in the anterior aspect, same as before. The range of motion was restricted and the strength was normal. But now, very interestingly, his painful arc was now up to 160 degrees, which is very significant because the idea is that the exam is similar to before the accident; however, if indeed this gentleman had sustained an acute tear of the rotator cuff four days before, he wouldn't have been able to lift his arm up to 160 degrees. The idea is that that's consistent with a small tear that's been there for a while. So, very similar to the exam before, but not consistent with an acute tear * * * of the rotator cuff occurring. So that exam on November 21st is very important.

{¶24} Dr. Gordon went on to discuss the 2008 MRI and how it related to the other clinical findings:

> [T]he MRI scan really is the gold standard to evaluate a tear now. The idea is that he did have some radiographic findings before the accident, specifically the changes at the greater tuberosity with the bone spurs * * * and that is consistent with a rotator cuff tear being present. But you can't say a hundred percent it's there. * * * [The MRI showed] that the acromioclavicular joint very importantly had the arthritic – hypertrophic arthritic changes. Hypertrophic means the bone reacts to the arthritis and makes more bone and bone spurs. So that the impingement on the rotator cuff going down on the cuff was significant on the MRI scan showing that it had, indeed, been impinging on the rotator cuff. And then we find that in this area where the supraspinatus tendon attaches to the greater tuberosity that there was a small tear there and that there were degenerative changes present at the insertion. So it confirms what was seen on the plain x-ray back in January 2007, and it confirms that a rotator cuff tear indeed is present.

Dr. Gordon additionally stated that, while "[t]he MRI was obtained about two months after the accident[,] * * * the impingement [he] saw on the MRI scan was there much longer than two months." It appears, that having the benefit of the MRI scan essentially provided Dr. Gordon with hindsight, allowing him to look at the previous clinical findings, which were non-diagnostic absent the MRI, and deduce that the rotator cuff tear was present prior to the car accident. Moreover, the surgical notes themselves provided Dr. Gordon with valuable information. He testified that "what you find at the surgery tells you a lot about what's been there." Dr. Gordon noted that the operative notes indicate that Dr. Steve Lippett, Mr. Blinn's orthopedic surgeon, "removed the undersurface of the anterior acromion" (part of the bony structures of the shoulder joint), and that he did so because it was "a pre-existing condition causing impingement." Dr. Gordon indicated that the impingement would not have been caused by the accident and instead was a pre-existing degenerative condition. On cross-examination, Dr. Gordon's testimony came full circle, again discussing the x-ray findings of minimal spurring along the greater tuberosity. Dr. Gordon seemed to clarify that the spurring along the greater tuberosity would not be the cause of the cuff tear, instead stating that, "[a]s the process of degenerative impingement that the degenerative rotator cuff tear occurs and the body reacts to it with the spurring, the formation of new degenerative bone in response to the tear, and a cause of the tear." In summarizing his thought process about the x-ray findings and the medical records, on cross-examination he testified that,

> the idea is that those findings on an X-ray are very supportive of a rotator cuff tear being present. And then when you combine that with his actual clinical complaints before the accident, and the fact that his shoulder was getting worse than it was before in the year before the accident, it all goes along that he had a rotator cuff tear in his shoulder in January of 2007.

Thus, ultimately, Dr. Gordon opined that Mr. Blinn did not sustain the rotator cuff tear from the accident; instead, concluding that the tear pre-existed the accident.

{¶25} Dr. Gordon did not personally examine the 2007 x-ray and the 2007 x-ray was not admitted into evidence. Thus, he had no basis on which to testify about what the x-ray showed. We agree that Dr. Gordon's periodic reference to "the X-ray" is problematic. We note that some of these instances occurred during cross-examination when the interaction between Mr. Blinn's counsel and Dr. Gordon was argumentative such that it is difficult to know whether Dr. Gordon's reference to x-ray was meant to reference the x-ray report. Even so, whether Dr. Gordon misspoke (i.e. referred to the x-ray instead of the x-ray findings) or purposefully referenced the x-ray instead of the findings, he should not have been able to testify in a manner that suggested that he viewed the actual x-ray. It appears that Mr. Blinn is in essence asserting that those portions of the testimony should have been stricken, despite the fact that such an argument is clearly outside the scope of his assignment of error (which asserts that Dr. Gordon's entire opinion should have been withheld from the jury). Even if we were to examine whether certain words or phrases should have been stricken from Dr. Gordon's testimony, Mr. Blinn has not demonstrated prejudice from those words or phrases in light of the fact that he has not demonstrated that Dr. Gordon's ultimate opinion should have been excluded pursuant to Evid.R. 703. *See* Civ.R. 61.

{¶26} From the totality of Dr. Gordon's testimony, it is difficult for this Court to conclude that Dr. Gordon's opinion should have been excluded under Evid.R. 703 because he relied in major part upon facts or data not admitted in evidence or perceived by him. While it is not clear how important Dr. Gordon's statement concerning the precise location of the bone spurs on the 2007 x-ray was in forming his ultimate opinion, it is clear that Dr. Gordon relied in

major part on other medical information that was admitted into evidence, i.e. information about Mr. Blinn's medical history and clinical exam findings, or data directly perceived by Dr. Gordon, i.e. the 2008 MRI. *See Farkas,* 126 Ohio App.3d at 798. Further, as it was Mr. Blinn's burden to demonstrate that, in forming his opinion, Dr. Gordon relied primarily on facts or data not perceived by him or not properly admitted into evidence, *see id.* at 801, we can only conclude that Mr. Blinn did not meet his burden. In light of the limited argument made by Mr. Blinn and our review of the record, we overrule Mr. Blinn's first assignment of error.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN PERMITTING BALINT'S MEDICAL EXPERT TO RENDER OPINIONS THAT WERE IN CONTRAVENTION OF EVID.R. 702(C).

{¶27} Mr. Blinn asserts in his third assignment of error that the admission of Dr. Gordon's opinion violated Evid.R. 702(C). We do not agree.

{¶28} Evid.R. 702 states:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

"In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 611 (1998).

{¶29} Mr. Blinn does not contest that Dr. Gordon's testimony meets the criteria set forth in Evid.R. 702(A) and (B). Thus, we turn to examining Evid.R. 703(C).

> In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court examines whether the expert's conclusion is based on scientifically valid principles and methods. A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial. Accordingly, we are not concerned with the substance of the experts' conclusions; our focus is on how the experts arrived at their conclusions.

(Internal citations omitted.) *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 16.

{¶30} While it is difficult to understand Mr. Blinn's argument with respect to Evid.R. 702(C), he seems to be arguing that certain statements made by Dr. Gordon are not supported by scientifically reliable evidence. We note that, in this assignment of error, Mr. Blinn does not appear to be challenging the validity of Dr. Gordon's overall opinion that the rotator cuff tear occurred prior to the car accident. Instead, Mr. Blinn appears to challenge pieces of Dr. Gordon's testimony, or how Mr. Blinn has interpreted Dr. Gordon's testimony, as violating Evid.R. 702(C) by not being based upon scientifically reliable evidence. We see several problems with Mr. Blinn's contention. First, Mr. Blinn points to Dr. Gordon's testimony and states that Dr. Gordon testified that "the January 31, 2007 radiology report established that there was spurring of the supraspinatus tendon at the enthesis to the greater tuberosity, which verified a rotator cuff tear[.]" We note that this precise phrasing is not used in the pages of the transcript

cited by Mr. Blinn.  Nonetheless, even assuming that phrasing was used, Mr. Blinn then claims such a statement is contrary to peer reviewed literature.  To support this position, Mr. Blinn cites a portion of a page of a treatise that he submitted with his written motion objecting to Dr. Gordon's testimony.  He asserts that page supports the notion that "[f]ormation of spurs at or near the insertion of the supraspinatus tendon are often of no consequence."  However, that page cited to does not mention spurring, and the underlined portions state that "[a]rticular and periarticular calcifications are often of no consequence, because most deposits remain inert" and that "[c]alcification at or near a tendon insertion is common.  The supraspinatus tendon is involved most frequently[.]"  Notably, during his testimony, Dr. Gordon adamantly denied that spurring and calcification were the same thing.  Even assuming that Dr. Gordon's opinions had to match those contained in the materials submitted by Mr. Blinn, we note that Mr. Blinn submitted only small portions of the articles or books, sometimes only a page, making it difficult to even know whether Mr. Blinn's assertions have any merit in and of themselves.  Accordingly, and particularly in light of the limited materials that Mr. Blinn submitted to the trial court for review, we cannot say that Mr. Blinn demonstrated that that statement was scientifically unreliable.

{¶31}  Mr. Blinn's other arguments in this assignment of error are similarly problematic. He states there is no evidence that he had an impingement by an acromial spur or a superior migration of the humeral head, which Mr. Blinn asserts would be diagnostic for a chronic rotator cuff tear.  However, Dr. Gordon testified that he did not think Mr. Blinn had a chronic rotator cuff tear.  Later, in his argument, Mr. Blinn maintains that, "[i]t is physically impossible for a bone spur of the AC joint to cause a tear of the supraspinatus tendon at the enthesis of the greater tuberosity."  For this proposition, Mr. Blinn offers no citation to any text or any testimony of his

own experts. Accordingly, based on what has been argued here and the limited information presented to the trial court, we cannot say that the trial court abused its discretion in concluding that Evid.R. 702(C) was not violated.

**{¶32}** The heart of Mr. Blinn's argument goes to the validity of Dr. Gordon's conclusions, not the validity of his methods. The question to be answered under Evid. R. 702(C) is whether Dr. Gordon's opinion is based upon valid principles and methods, not whether his opinion is correct.

**{¶33}** Dr. Gordon is a board-certified orthopedic surgeon. The record reflects that he based his opinion on his medical training and experience and his review of various medical records and the 2008 MRI scan. *See Theis v. Lane,* 6th Dist. Wood No. WD-12-047, 2013-Ohio-729, ¶ 19 ("A review of medical records in a medical malpractice action, as was performed [here], coupled with [] vast experience, are appropriate principles and methodologies to be used by a physician expert in forming medical opinions."). Aside from the fact that Dr. Gordon did not conduct an actual examination of Mr. Blinn, or view the 2007 x-ray, we can discern no difference between the methods and procedures used by Dr. Gordon and those used by Mr. Blinn's expert. The difference between the experts is that, based upon much of the same information, the two came to opposite conclusions as to the cause of Mr. Blinn's injury. However, as noted above, the purpose of Evid.R. 702(C) is not to evaluate the merit of the conclusions reached by the experts. *See Valentine,* 110 Ohio St.3d 42, 2006-Ohio-3561 at ¶ 16. Accordingly, we overrule Mr. Blinn's third assignment of error.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN PERMITTING BALINT'S MEDICAL BILLING EXPERT TO RENDER OPINIONS WHEN THE OPINIONS WERE NOT SUPPORTED BY FACTS OR DATA PERCEIVED BY THE EXPERT OR

ADMITTED IN EVIDENCE IN CONTRAVENTION OF EVID.R. 703 AND 705.

{¶34} Mr. Blinn asserts in his second assignment of error that the admission of Mr. Balint's medical billing expert's testimony violated Evid.R. 703 and 705. In support of his claim, Mr. Blinn submitted an exhibit detailing all his medical bills and expenses which totaled over $65,000. The medical billing specialist's testimony was offered by the defense to rebut the amount of damages submitted by Mr. Blinn. Mr. Balint's medical billing expert testified that the reasonable value of services received by Mr. Blinn ranged from just over $18,000 to almost $22,000. The parties are in agreement, that, in light of the jury's small damage award of only $200, the jury did not credit the testimony of Mr. Balint's medical billing expert in making its damages award. Accordingly, even assuming that the medical billing expert's testimony did not comport with the requirements of Evid.R. 703 and 705, any error would be harmless. *See* Civ.R. 61. Accordingly, we overrule Mr. Blinn's second assignment of error.

III.

{¶35} In light of the foregoing, we overrule Mr. Blinn's assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

 

EVE V. BELFANCE
FOR THE COURT

 

 

MOORE, P. J.
CONCURS.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶36} I concur in the majority's judgment. I would resolve the first assignment of error solely on the basis that Mr. Blinn did not meet his burden of demonstrating that Dr. Gordon based his opinion on information outside the scope of Evid.R. 703. In considering whether expert testimony is admissible pursuant to Evid.R. 703, this Court has recognized that "[a]s long as an expert bases an opinion at least in major part on facts or data perceived by him or admitted into evidence Evid.R. 703 has been satisfied." *Farkas v. Detar*, 126 Ohio App.3d 795, 798 (9th Dist.1998). Moreover,

> Just because [the expert] reviewed extensive documentation not in evidence does not necessarily mean that it was the principal basis for his opinion. * * * It was [the] burden [of the party opposing admission of the expert's testimony] to establish that the expert, in forming his opinion * * *, relied principally on facts

not perceived by him and not properly admitted into evidence, in violation of Evid.R. 703.

*Id.* at 799, 801.

**{¶37}** Mr. Blinn failed to meet his burden of establishing on which facts or data Dr. Gordon principally relied. Accordingly, I agree that Mr. Blinn's first assignment of error must be overruled.

APPEARANCES:

TIMOTHY H. HANNA, Attorney at Law, for Appellant.

KIMBERLY K. WYSS and ROBERT J. MCBRIDE, Attorneys at Law, for Appellee.